IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TODD A. CARLSON,

                     Plaintiff,

    v.

TACTICAL ENERGETIC ENTRY
SYSTEMS, LLC, and MAXUM
CASUALTY INSURANCE COMPANY,

                     Defendant,

   and

CITIES & VILLAGES MUTUAL INSURANCE
COMPANY,

                     Subrogated Party.

OPINION AND ORDER

14-cv-248-wmc

---

      Plaintiff Todd A. Carlson, a police officer with the City of Superior Police Department, brings claims for negligence and violation of Wisconsin's Safe Place Statute, Wis. Stat. § 101.11, against Tactical Energetic Entry Systems, LLC ("TEES"), and its insurer, Maxum Casualty Insurance Company. In particular, Carlson alleges that TEES's administration and oversight of a training exercise was lacking and resulted in Carlson needlessly sustaining a significant injury to his left wrist. Before the court is defendants' motion for summary judgment (dkt. #33) which the court will grant in part because: (1) Carlson has failed to come forward with expert testimony required to prove all but one of his negligence theories; and (2) TEES is neither an employer or owner for purposes of the Safe Place Statute.[1] Carlson will be allowed to proceed on a single negligence theory

---

[1] Cities & Villages Mutual Insurance Company was also named by TEES as a subrogated party.

based on his claim that after providing training on a so-called "spider-hang" technique specifically using a fixed wall, it was negligent to require police trainees to then undergo a timed, competitive race through a tactical course that called for use of a spider hang without at least providing a warning that no fixed wall existed below the roof line that called for the use of the spider-hang technique.

## UNDISPUTED FACTS[2]

**A. The Parties**

Plaintiff Todd Carlson has been a duly licensed law enforcement officer employed by the City of Superior Police Department in Superior, Wisconsin since January 1995. Carlson currently serves as a patrol officer. For five to six years, he has also been a part of the "Emergency Response Team," which is the Superior Police Department's SWAT unit.

Defendant Tactical Energetic Entry Systems, LLC, provides tactical training to law enforcement officers and military personnel. While noting that its focus is on mechanical, explosive and thermal breaching, plaintiff does not dispute this. When the program at issue occurred in October 2011, TEES trainer John Mayer was part owner of the company. Mayer relinquished his ownership interest in February 2014. TEES is

---

[2] Defendants failed to file a reply in support of their proposed findings of facts, leaving the court to guess as to how defendants might respond to those facts plaintiff disputed. Moreover, in response to virtually every one of plaintiff's proposed findings of facts, defendants simply "objected" that the proposed fact was irrelevant and immaterial. While perhaps true for some facts, this general objection does not aid the court in setting forth the undisputed facts. With those concerns aside, for purposes of summary judgment, the court finds the following facts to be material and undisputed except as otherwise noted.

currently owned by Alan Brosnan and Pamela Vaughan, with Brosnan as the majority owner.[3]

Mayer had been involved in tactical training since November 1986, and he began teaching tactical courses in August 2005. Mayer claims to be certified in the following TEES courses: hostage rescue/high risk warrant course; sniper course; dignitary protection course; explosive handlers course; explosive entry course; advance explosive entry course; thermal and ballistic breaching course; and mechanical and ballistic breaching instructors course. Mayer is also certified by the National Rifle Association to instruct the NRA's handgun course and by the Tactical Firearms Training Team to instruct a combat arts seminar course. Mayer has also received a number of certificates and diplomas from various organizations including the United States Army.

B. Breaching Training Course

In response to a request, TEES submitted a proposal to the Eau Claire Police Department Lieutenant Rodney Stearns, which included the general requirements to conduct a proper breaching course.[4] This proposal was accepted, with the Eau Claire

---

[3] The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). Plaintiff Carlson is a citizen of Minnesota. (Am. Not. of Removal (dkt. #8) ¶ 7.) Defendant TEES is a citizen of Mississippi. (*Id.* at ¶ 8 (alleging that TEES has two members, both of whom are individuals and citizens of Mississippi).) Defendant Maxum Indemnity Company is citizen of Georgia, having been organized in that state and with its principal place of business also in Georgia. (*Id.* at ¶ 9.) The amount in controversy exceeds $75,000. (*Id.* at ¶ 10; Compl. (dkt. #8-1) p.8 (listing relief requested as compensatory damages, medical expenses, lost wages, and pain and suffering, among other items).)

[4] The parties fail to provide any definition of "breaching." From the court's cursory research, "[d]oor breaching is a process used by military, police, or emergency services to

3

Police Department to act as the hosting agency for a training to be held in October 2011. Most of the equipment needed for the training was provided by the Eau Claire Police Department, ultimately including doors on which the trainees could practice mechanical and ballistic breaching techniques. Lieutenant Stearns also arranged for the training to take place at Volk Field in Camp Douglas, Wisconsin.

TEES played *no* role in arranging for the use of Volk Field, nor does TEES currently have, nor did it ever have, an ownership interest in or lease agreement for the use of Volk Field. In addition, TEES's instructor Mayer had never been to Volk Field before the day of the training program.

The program itself was designed to train participants on breaching techniques so that they could return to their departments and train other officers. The planned topics included: the history and theory of non-explosive methods of entry; equipment selection; carriage of tools and shotgun; breaching inward opening doors; breaching outward opening doors; ballistic breaching techniques; planning considerations; scenario-based training; lesson plan development; and how to properly present the lesson plans.

Mayer was not only the sole instructor for the course, but also the sole representative of TEES at Volk Field. Deputies Peter Forbes and Spence Olson (both presumably of the Eau Claire Police Department, although defendants fail to specify)

---

force open closed and/or locked doors. A wide range of methods are available, one or more of which may be used in any given situation. These methods may be divided up into mechanical breaching, ballistic breaching, explosive breaching, and thermal breaching." "Door Breaching," Wikipedia, https://en.wikipedia.org/wiki/Door_breaching (last visited June 26, 2015).

served as liaison officers, assisting Mayer logistically and administratively, although Mayer had sole discretion as to which techniques to teach in the course.

Upon arrival at Volk Field on October 10, 2011, Deputy Forbes testified at his deposition that Mayer, Olson and Forbes walked the entire obstacle course to observe what types of structures were available.  During the walk through, Forbes testified that Mayer negotiated each obstacle to check it for safety.  TEES policy requires such a walkthrough to inspect the course for hazards or safety risks.[5]  Mayer also made and hung some doors for trainees to practice breaching techniques.

### C.  October 2011 TEES Breaching Course

The first day of the breaching course was October 11, 2011.  Plaintiff Carlson was one of the trainees.  The trainees were taught breaching techniques through verbal instruction and physical demonstration, as well as by performing the techniques under Mayer's supervision.  Where the structures at a facility are sufficient, Mayer typically taught the trainees how to execute a "spider-hang technique" -- a descent technique in which one lowers his body by hanging from a ledge and then controls his descent to the ground.[6]  Defendants further explain that the technique is a "military and law enforcement technique used to clear the front of the obstacle, [and] descend from the

---

[5] While Mayer testified that he did not recall if he walked through the course prior to the training at Volk Field, it is undisputed that a walkthrough took place in light of Forbes' testimony.

[6] Plaintiff does not dispute this but points out that the spider-hang is "not part of the guide for the course."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #47) ¶ 64.)

roof or structure that minimizes exposure to hostile fire or detection and minimizes the impact upon landing on the ground." (Defs.' PFOFS (dkt. #35) ¶ 66.)[7]

After Mayer demonstrated this technique, Carlson and other trainees were given an opportunity to practice it on a cement wall. Carlson emphasizes that during this stage, the trainees were instructed to brace their feet against the wall as they descended. Defendants dispute this characterization, explaining in part that the trainees were instructed to maintain three points of contact until they started their descent, at which point they would maintain only two points of contact -- their hands -- until the point where they were able to drop to the ground. (Defs.' Resp. to Pl.'s PFOFs (dkt. #53) ¶ 12; *see also* Pl.'s PFOFs (dkt. #48) ¶ 13.)

The next day, October 12, 2011, the training culminated with a "full mission scenario," essentially a timed, competitive event incorporating all of the techniques taught during the course under stressful conditions. It was during this scenario that Carlson was injured.

Defendants contend that the full mission scenario was explained to the trainees in the classroom before going out onto the obstacle course area. Plaintiff nevertheless contends that only "portions" were explained, and that most notably, there was no mention that the roof line below which trainees were expected to drop using the spider-hang technique "was a dugout," which Carlson maintains he only later learned meant no

---

[7] Based again on the court's cursory research, it would appear that this technique is also known as the "spider drop," which seems a more apt description since no wires or other equipment is used. Instead, it appears to be a technique used to hang from the edge of a structure to reduce the distance to the ground and then drop in a controlled manner to land safely.

6

wall was present below the roof to brace one's feet against before executing a "drop." (Pl.'s Resp. to Defs.' PFOFs (dkt. #47) ¶ 72.) Indeed, an overhead view of the obstacle course was drawn out for the trainees on a white board in the classroom, demonstrating to the trainees where they should go and providing at least some description of the techniques to be used. After these verbal instructions, the trainees were then walked through at least part of the obstacle course, but plaintiff maintains that the trainees were *not* shown the dugout below the roof line at this time. During the walkthrough, Mayer again instructed the trainees as to which techniques to use for at least some of the obstacles.

The class was then divided into two groups, with Carlson in the first group. Carlson's injury occurred on the obstacle labeled "roof" or "dugout," where the trainees had been told to use the spider-hang technique to control their descent. Unaware that this part of the obstacle had no vertical wall face, Carlson described what happened next at his deposition:

> I get to the edge of the roof, get down on my stomach to the edge of the roof. I swing the first leg over. I'm hooked on the edge of the roof with my one toe. As I'm bringing the second leg down and feeling for [] the wall [] to plant my feet against [] as trained to support myself and control my descent, my feet don't find a wall; my feet continue to swing inside to the point where I've -- I've now lost my balance, and the weight of my -- my lower half of my body is pulling me off of the edge of this roof. And I can't -- with the weight that I have attached to me, there is no -- nothing for my feet to catch in support underneath.

(Deposition of Todd A. Carlson ("Carlson Depo.") (dkt. #44) 99.) Carlson fell backwards, somehow arched his back to use his hands and arms to brace before hitting

the ground and injuring his left wrist. This injury required surgery where a steel plate and numerous screws were inserted. At least one other trainee also fell, which he too attributed to the absence of a vertical wall for bracing.[8]

### D. Negligence Theories

In his amended complaint, Carlson alleges that Mayer directed him "to proceed to an unseen, and unseeable, obstacle which was not proper for the 'spider hang' technique." (Am. Compl. (dkt. #8-2) ¶ 11.) Carlson further alleges that TEES was negligent by failing to "exercise proper control and authority over the training area" and "did not adequately inspect, build, regulate and otherwise provide and maintain a safe area to conduct said training." (*Id.* at ¶ 12.) In response to interrogatories, Carlson clarified his negligence claim as:

> TEES, by their employees or instructors, was negligent in their administration and oversight of the training exercises. Specifically, they failed to appropriately assess safety concerns, failed to accurately instruct trainees regarding techniques to use at specific points in the training, and provided ineffective and dangerous instruction to their trainees.

(Affidavit of Michael K. Roberts ("Roberts Aff."), Ex. I (dkt. #39-9) ¶ 24.)

---

[8] In his proposed findings of facts, plaintiff notes evidence of other unsafe aspects of the training course, including unstable pieces of concrete, protruding nails and pieces of rebar. These facts are not directly material to plaintiff's claim of negligence leading to his injury, although they may undermine TEES's claim that Mayer adequately inspected the area, serve as evidence of the general unsafe nature of the obstacle course, or perhaps is offered in support of plaintiff's safe place claim.

The Preliminary Pretrial Conference Order set a deadline of September 15, 2014, for plaintiff as the proponent of his negligence and Safe Place Act, Wis. Stat. § 101.11, claims to disclose expert testimony. (5/20/14 Order (dkt. #14) ¶ 2.) On September 17, 2014, plaintiff served his expert disclosure on defendants, naming eleven medical experts and one liability expert, Jon V. Tofte. Defendants then filed a motion to exclude plaintiff's expert witnesses on the basis that the disclosures failed to meet the requirements of Federal Rule of Civil Procedure 26(a)(2). In response, plaintiff served amended expert disclosures, naming one medical expert and a new liability expert, Dennis Skogen. Plaintiff also filed a motion to enlarge the time to serve his expert disclosures.

On November 13, 2014, after holding a hearing, the court decided the parties' cross-motions concerning expert disclosures. While sanctioning plaintiff for the disruption caused by his failures to make timely, complete expert disclosures, the court gave plaintiff until November 21, 2014, to serve expert disclosures in compliance with Rule 26(a)(2).[9] The court also extended the deadline by which defendants were to serve their expert disclosures, as well as the dispositive motion deadline. On November 19, 2014, plaintiff served an amended expert disclosure retaining the one medical expert but

---

[9] Specifically, the court sanctioned plaintiff by requiring him to pay defendants' reasonable attorneys' fees and costs incurred in having to bring and respond to these motions and ordered defendants to submit their request and set a deadline for plaintiff's response. (11/13/14 Order (dkt. #29) p.10.) Defendants submitted a request for $4,356.00 and provided time records and hourly rates in support of the request. (11/18/14 Affidavit of Michael K. Roberts (dkt. #31) ¶¶ 2-3.) Plaintiff did not file a response. Since the amount requested is well-documented and appears reasonable, the court will award it in full.

withdrawing Skogen as an expert. Critically, for purposes of the motion before this court, plaintiff failed to name any other liability expert. Defendants timely served their expert disclosure, naming Robert Willis as their liability expert.

OPINION

I. Expert Testimony Requirement

"Whether expert testimony is necessary to support a given claim is a question of law." *Trinity Lutheran Church v. Dorschner Excavating, Inc.*, 2006 WI App 22, ¶ 26, 289 Wis. 2d 252, 710 N.W.2d 680. The general rule in Wisconsin is expert testimony is required for "matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience." *Payne v. Milwaukee Sanitarium Found.*, 81 Wis. 2d 264, 376, 260 N.W.2d 386, 392 (1977); *see also Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 147, 150, 172 N.W.2d 427, 428 (1969).

In response, plaintiff points to Wisconsin's adoption of the dissenting position in *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (N.Y. 1928), that "[e]very one owes to the world the duty of refraining from those acts that may unreasonably threaten the safety of others." *Id.* at 103 (Andrews, J., dissenting). While this is the law in Wisconsin, *see Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 644 n.12, 517 N.W.2d 432, 439 n.12 (1994), the general adoption of this general principal does not provide the standard required to decide if special expertise is required to assist a lay jury in understanding the level of care required for a particular activity. "That standard is inherently quite abstract

and must be defined more specifically for any given case." *Lees v. Carthage Coll.*, 714 F.3d 516, 522 (7th Cir. 2013) (citing *Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 32, 291 Wis. 2d 283, 717 N.W.2d 17). In other words, while Wisconsin recognizes a general duty of care, the scope of that duty varies, and in certain circumstances, expert testimony *is* required to determine the specifics of defendant's duty of care and, relatedly, whether defendant breached that duty. *See Lees*, 714 F.3d at 522 ("Where the specifics of a defendant's duty of care involve specialized knowledge, plaintiffs must introduce expert testimony to establish this element of a negligence claim.") (citing *Payne*, 260 N.W.2d at 392).

For their part, defendants' primary argument is that expert testimony is required because the negligence claim rests on Mayer's professional judgment. (Defs.' Br (dkt. #34) 13.) But expert testimony is not required in all cases concerning professional negligence or malpractice claims. Instead, "expert testimony will generally be required to satisfy this standard of care as to those matters which fall outside the area of common knowledge and lay comprehension." *Racine Cnty v. Oracular Milwaukee, Inc.*, 2009 WI App 58, ¶ 40, 317 Wis. 2d 790, 767 N.W.2d 280 (quoting *Pierce v. Colwell*, 209 Wis. 2d 355, 362, 563 N.W.2d 166 (Ct. App. 1997)); *see also In re Estate of Rille ex rel. Rille*, 2007 WI 36, ¶ 43 n.22, 300 Wis. 2d 1, 728 N.W.2d 693 ("Not all cases alleging negligence of licensed professionals require expert testimony: '[T]he necessity for expert testimony depends upon the type of negligent acts involved.'" (quoting *Payne*, 81 Wis. 2d at 275-76, 260 N.W.2d 286)). Accordingly, the critical question here is whether the standard of

care required for tactical police training falls outside of "common knowledge and lay comprehension." *Oracular Milwaukee*, 2009 WI App 58, at ¶ 40.

The crux of plaintiff's negligence claim is that TEES (through its agent Mayer) breached a duty of care owed to plaintiff by having him use a technique -- the spider-hang -- (1) on an inappropriate structure for use of that technique and (2) for which plaintiff had not been adequately trained. Based on the record at summary judgment, the court agrees that a lay jury would require expert guidance to understand: (1) whether the spider-hang technique should only be used where an individual can brace himself against a solid wall; and (2) whether a trainee instructed to use this technique against a solid wall would be able to translate that lesson to a situation lacking the wall. Notwithstanding plaintiff's argument to the contrary, this assessment requires specialized knowledge. "It is one thing for a jury unaided by expert testimony . . . to assess the care with which the defendant in an automobile accident case drove, for that is something with which almost all jurors are familiar; it is another thing for a jury to determine the right standard of care to which to hold" a technical training company like defendant TEES. *Shadday v. Omni Hotels Mgmt. Corp.*, 477 F.3d 511, 515 (7th Cir. 2007); *see also Lees*, ("[E]xpert testimony is required to establish the standard of care in negligence cases . . . which involve issues of safety, security[,] and crime prevention.") (quoting *Varner v. District of Columbia*, 891 A.2d 260, 267 (D.C. 2006)); *Caldwell v. J.H. Findorff & Son, Inc.*, 2005 WI App 111, ¶ 28, 283 Wis. 2d 508, 698 N.W.2d 1232, 2005 WL 1077466, at *8 (Ct. App. Apr. 21, 2005) (unpublished) ("[E]xpert evidence is necessary here to establish

a general contractor's standard of care when installing a soffit, or in supervising and inspecting a subcontractor's installation of a soffit, for a building of this type.").

The cases cited by plaintiff in opposition are either distinguishable from the case at hand or simply fail to advance his argument. First, plaintiff looks to *Dakter v. Cavallino*, 2014 WI App 112, ¶¶ 39-40, 358 Wis. 2d 434, 856 N.W.2d 523, for support. In that case the Wisconsin Court of Appeals did not consider whether expert testimony was required. Rather, the *Dakter* court simply explained that the superior knowledge of the defendant factors into the standard of care he owed. *Id.* While Mayer's superior knowledge of tactical training certainly factors into the standard of care he owed to Carlson, it does not address whether a lay jury could determine what the standard of care itself was in light of the technical nature of tactical training generally and the spider-hang technique specifically. Second, plaintiff cites *Trinity Lutheran Church*, 2006 WI App 22, at ¶ 26. In that case, the plaintiff did present expert testimony on what caused a water main pipe to break. *Id.* at ¶ 10. The *Trinity* court held, however, that expert testimony was not required to support the basic proposition that with "the exercise of reasonable care by those working on a construction site and those responsible for coordinating the work, a water lateral should not be struck by a backhoe." *Id.* at ¶ 27. Here, if anything, the opposite would seem more likely: even with the exercise of reasonable care, a trainee engaged in physically demanding exercises may get hurt. That is why those involved in athletic events are generally required to sign waivers of liability -- some risks are inherent in the activity.

13

Of course, this is not to say that TEES (or its agent Mayer) are free from all liability claims. Rather, the court simply agrees with defendants that what duty TEES owed Carlson and the other participants with respect to where and how to teach the spider hang technique falls outside a lay jury's "common knowledge and lay comprehension." *Oracular Milwaukee*, 2009 WI App 58, at ¶ 40.

This still arguably leaves Carlson's claim that TEES and Mayer's should have reasonably foreseen that a trainee would have expected that the spider-hang technique as taught would be effective during the more intense, competitive race through an obstacle course, at least without any instruction on the proper technique for hanging and dropping without a fixed wall. Defendants rightly point out that the unexpected is an essential part of any training exercise, just as it is in police work generally, and argue that Carlson should have known this without any instruction or warning, which certainly rings true, but this is an argument that a lay jury *can* understand and decide without expert guidance.

Specifically, Carlson maintains (1) he was instructed that the spider-hang technique is only used with one's legs against a fixed wall, something defendants dispute; and (2) he was directed to use that technique when dropping off the roofline during a timed training exercise at the close of the course without a sufficient overview of the specific obstacle, something defendants also dispute. Assuming a jury credits Carlson's testimony, which seems unlikely but not wholly unreasonable on the current record, a lay jury may decide that Mayer's October 11th instruction of the spider-hang technique

14

failed to meet the basic safety standards of a police trainer.[10] Indeed, defendants essentially concede plaintiff's version of the instruction would be wrong and assert that Mayer taught no such thing. Similarly, again assuming the jury credits Carlson's testimony, a lay jury may decide that leaving trainees with at least the general impression that they should expect a fixed wall below a roofline would not meet that same standard. Here, too, defendants maintain they did no such thing.

In the end, the court finds expert testimony is necessary for Carlson to present a negligence claim based on any theory that use of the spider-hang technique in the "roof" obstacle, viewed in isolation, was a breach of a standard of care. Rather, to prove his claim, Carlson must demonstrate first that Mayer's instruction of the technique limited it to instances where a vertical wall was available for placement of the trainees' feet, *and* second that Mayer failed to either (a) inform the trainees generally that the obstacle course may require them to adapt the techniques taught to new situations or (b) apprise the trainees that there was no fixed wall beneath the roof obstacle. In other words, if Carlson can prove that Mayer failed to teach TEES's approved technique for the spider hang (Roberts Aff., Ex. G (dkt. #39-7) p.9) and warn the trainees of the general or specific risks of failing to adapt that technique to new circumstances, then a lay jury may find that Mayer's instruction and description of the obstacle course breached the duty of care he owed Carlson and the other trainees. It will be for the court, with the parties' input, to fashion an appropriate jury instruction to define that standard for the jury.

---

[10] Of course, if the court determines that Carlson's version is wholly incredible or unreasonable based on the evidence at trial, it may still direct a verdict on this remaining negligence theory.

Finally, plaintiff appears to argue that preventing even some of his negligence theories from reaching a jury based on the lack of expert testimony is an "extraordinary step." (Pl.'s Opp'n (dkt. #46) 9.) While the court does not make such decisions lightly, it is the court's responsibility to decide whether a standard of care and the defendants' breach of that standard is "reasonably comprehensible to the jury." *Trinity Lutheran Church*, 2006 WI App 22, at ¶ 26 (quoting *City of Cedarburg v. Allis-Chambers Mfg. Co.*, 33 Wis. 2d 560, 567, 148 N.W.2d 13 (1967)). The record reflects that plaintiff himself recognized the need for expert testimony and -- for reasons remain unclear -- repeatedly failed to secure an expert, or at least an expert willing to opine formally as to TEES's breach of the appropriate standard of case.

In reviewing motions to strike under Federal Rule of Civil Procedure 703 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993), most courts, including this one, will allow expert testimony to go to the jury, because most criticisms go to the factual assumptions underlying the expert's opinion or the weight the jury should place on that opinion. This is not such a situation; rather, plaintiff rolled the dice by simply failing to proffer any expert testimony. Because expert testimony was needed here on the standard of care and TEES's alleged negligence with respect to all but one of plaintiff's theories, the court will narrow plaintiff's negligence claim to that theory alone and partially grant defendants' motion for summary judgment as to any other claim. [11]

---

[11] Defendants also argue that expert testimony is needed to demonstrate that "the 'roof' structure was unsafe or in hazardous condition" for purposes of proving a violation of Wisconsin's Safe Place Statute. (Defs.' Br. (dkt. #34) 16.) Defendants fail to cite any case law in support of this argument. Regardless, the court finds defendants' alternative

**II. Application of Safe Place Statute**

Wisconsin's Safe Place Statute provides in pertinent part:

> *Every employer* shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. *Every employer and every owner* of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

Wis. Stat. § 101.11(1) (emphasis added). In its opening brief, defendants contend that TEES is not an owner of Volk Field and, therefore, cannot be liable under the Safe Place Statute.

In response, plaintiff essentially concedes, as it must, that TEES is not the owner of Volk Field. Instead, plaintiff contends that TEES was an employer and Carlson was a frequenter of Volk Field. With respect to this argument, the relevant portion of Wisconsin's Safe Place Statute -- as quoted fully above -- requires employers to furnish a safe place of employment for frequenters of that place of employment. Wis. Stat. § 101.11(1). Plaintiff, however, fails to advance any argument or direct the court to any evidence in the record that TEES is an employer. More critically, plaintiff offers no legal authority for the proposition that TEES's one time use of Volk Field for a training

---

basis for summary judgment -- that TEES fails to meet the definition of either an owner or employer -- provides a sounder basis for granting defendants' motion as to that claim.

17

exercise by one of its agents somehow renders it TEES's place of employment.[12] Since the opposite would seem substantially more likely, the court will also grant defendants' motion for summary judgment of plaintiff's Safe Place Statute claim.

ORDER

IT IS ORDERED that:

1) Defendants Tactical Energetic Entry Systems, LLC and Maxum Indemnity Company's motion for attorneys' fees (dkt. #30) is GRANTED. Plaintiff is ordered to pay defendants $4,356.00 in attorneys' fees.

2) Defendants' motion for summary judgment (dkt. #33) is GRANTED with respect to plaintiff's Safe Place Statute claim and GRANTED IN PART AND DENIED IN PART with respect to plaintiff's negligence claim as set forth above.

Entered this 26th day of June, 2015.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

---

[12] Wis. Stat. § 101.01(4) defines an employer as "any person, firm, corporation, . . . as well as any agent, manager representative or other person having control or custody of any employment, place of employment or any employee."